# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

CATHERINE MARY ELLIS,

Plaintiff,

v.                                                          3:11-CV-1205
                                                            (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

PETER A. GORTON, ESQ., for Plaintiff
AMANDA LOCKSHIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On March 12, 2010, plaintiff protectively[1] filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning July 25, 2009, based upon a knee injury and mental impairments. (Administrative Transcript ("T.") at 117-18). Plaintiff's application was denied initially on May 21, 2010 (T. 54-59), and plaintiff

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 404.630. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date. Plaintiff's actual application in this case is dated March 24, 2010. (*Compare* T. 47 *with* 117).

requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff[2] and her attorney[3] appeared at a hearing before ALJ John P. Ramos on April 1, 2011. (T. 17-46).  On May 25, 2011, the ALJ found that plaintiff was not disabled from July 25, 2009 until the date of the ALJ's decision. (T. 8-16).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 19, 2011. (T. 1-3).

## II.    ISSUES IN CONTENTION

The plaintiff makes the following arguments:

(1)    The ALJ failed to properly assess plaintiff's Residual Functional Capacity ("RFC") with respect to her non-exertional psychiatric impairments. (Pl.'s Br. at 7-13).

    a.    The ALJ failed to properly consider the treating physicians' opinions regarding plaintiff's psychiatric impairments.

    b.    The ALJ failed to consider plaintiff's agoraphobia as a "severe" impairment.

    c.    The ALJ failed to properly assess plaintiff's credibility regarding her mental limitations.

(2)    The ALJ erred when he failed to use the services of a Vocational Expert ("VE").

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed.  For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

---

[2] Plaintiff appeared by video conference from Binghamton, New York. (T. 8, 19).

[3] The court notes that the ALJ's decision states that plaintiff was represented at the hearing by "Jared Baker, a non-attorney representative." (T. 8).  However,  Mr. Baker is an attorney, as evidenced by his signature on a letter addressed to the ALJ and by his name on the letterhead of the law firm. (*See* T. 207) (signature of Jared Baker, Esq.)

## III.    APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth

inquiry is whether, despite the claimant's severe impairment, he has the
residual functional capacity to perform his past work.  Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.

*Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the

decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   **FACTS**

Plaintiff testified that she originally stopped working as a nursing assistant on July 25, 2009, because she suffered a knee injury at work.[4] (T. 26).  She has since had two surgeries on her left knee, and is limited to sedentary work as a result of her physical impairments. (T. 15).  Plaintiff's arguments in this case are based only upon the additional limitations that her non-exertional psychiatric impairments place upon her ability to perform the full range of sedentary work.  Plaintiff does not dispute her

---

[4] She testified that, after she stopped working in July of 2009, she attempted to return to "light-duty" work for the same employer in October of 2009, but stopped because the work became "too uncomfortable" due to her knee condition.  (T. 27).  There was no mention of a mental impairment as a basis for plaintiff leaving her employment.

ability to perform the physical requirements of sedentary work. (Pl.'s Br. at 1-2).

Therefore, this court will focus upon the plaintiff's psychiatric impairments and the

medical evidence related to those impairments.

Defense counsel and the ALJ have extensively discussed the evidence in this

case. (Def.'s Br. at 2-7; T. 13-15).  Defense counsel has also incorporated the

summary of medical evidence as set forth by the plaintiff's counsel at pages 1-7 of his

brief, "with the exception of any inferences, arguments, or conclusions asserted

therein." (Def.'s Br. at 2).  This court will adopt the facts as discussed by both counsel,

together with the facts as stated in the ALJ's decision, with any exceptions as noted in

the following discussion.

## V.   <u>THE ALJ'S DECISION</u>

The ALJ found that plaintiff's depressive disorder and panic disorder were

"severe" under the statute. (T. 10).  The ALJ also found that neither mental

impairment was severe enough to meet the requirements of a listed impairment under

Step Three of the disability analysis.[5] (T. 11-12).  The ALJ began his discussion of

plaintiff's mental impairments by stating that in March of 2010, plaintiff sought

emergency treatment for complaints of anxiety and depression. (T. 13).  The ALJ

reviewed plaintiff's mental health records subsequent to the emergency room visit and

determined that one of plaintiff's providers had also diagnosed a "panic disorder," but

stated that plaintiff was in the early phases of treatment and would have to be re-

evaluated in six months. (T. 14).

---

[5] Plaintiff does not challenge this finding.

The ALJ then reviewed a consultative mental examination from May of 2010. The examiner diagnosed depressive disorder and panic disorder, but found that plaintiff was capable of understanding and following simple instructions and directions, capable of performing simple and some complex tasks with supervision, and independently capable of maintaining attention and concentration for tasks. (T. 14). The ALJ also stated that plaintiff could regularly attend to a routine, maintain a schedule, was capable of learning new tasks, making appropriate decisions, and could relate to and interact moderately well with others, even though she had some problems with stress. (T. 14).

Based on this medical evidence, the ALJ determined that although plaintiff had some mental limitations, related to "her mood and anxiety disorders, she can perform many work related functions with little or no problem." (T. 14). The ALJ found that plaintiff's mental condition was responsive to medication, and "treatment has been of recent duration and minimal."   Her global assessment of functioning[6] ("GAF") scores have been in the mild to moderate range, and the examiners have noted that she is cooperative and oriented. (T. 14-15). The ALJ discounted plaintiff's assessment of her mental limitations, finding that they were only partially substantiated by the objective evidence. (T. 15).

The ALJ found that plaintiff's mental impairments, and the additional limitations that they caused, did not affect the occupational base of unskilled sedentary

---

[6] The Global Assessment of Functioning Scale (GAF) is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34.

work, and plaintiff retained the ability to perform the basic mental demands of competitive, remunerative, unskilled work on a sustained basis. (T. 16).  These demands included the ability to understand, carry out, and remember simple instructions, to respond appropriately to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting. (*Id.*)  Using the Medical-Vocational Guidelines as a framework, and finding that plaintiff had the physical capacity to perform sedentary work, the ALJ found that plaintiff was not disabled under Rule 201.21. 20 C.F.R. Pt. 404, Subpt. P, App.2 § 201.21 ("the Grid").

## VI.  **DISCUSSION**

### A.    **Severe Impairments**

#### 1.    **Legal Standards**

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A  severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3)

understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404. 1521(b).  It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3).  The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken.  *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step Two may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone.  *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)).

9

This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### 2.   Application

In this case, at Step Two of the disability analysis, the ALJ found that plaintiff's depression and panic disorders were severe impairments along with the degenerative joint disease of her left knee.  He did not mention "agoraphobia" in his severity determination.  However, finding that two of plaintiff's impairments were "severe" allowed the ALJ to continue to Step Three of the analysis to consider whether plaintiff had a listed impairment.  The ALJ did not deny benefits based on the lack of a severe impairment.  As stated above, after the Step Two analysis, the ALJ was required to consider all of plaintiff's impairments even if all were not severe. 20 C.F.R. § 404.1523. Thus, at worst, the ALJ's failure to find that plaintiff's agoraphobia was a severe impairment was harmless error.

The court notes that the ALJ did consider plaintiff's agoraphobia in his subsequent analysis of her claims.  In his discussion of listed impairments and plaintiff's limitations with respect to social functioning, the ALJ found "moderate difficulties." (T. 11).  He stated that "[t]he claimant reports panic disorders *and agoraphobia*, although she has been described by several health care providers as at ease and no objective evidence has been noted." (*Id.*)

The ALJ's analysis is supported by substantial evidence.  Plaintiff stopped

10

working in July of 2009, based solely upon her knee injury.  Although the medical records show that plaintiff had a "history" of depression, anxiety, and prior alcohol abuse as stated in a May 9, 2008 medical report, authored by treating Physician's Assistant ("PA"),[7] Joseph Brunt (T. 294), plaintiff continued working until July of 2009, and did not stop working based on any psychological issues.  PA Brunt is plaintiff's primary care practitioner, who has taken care of plaintiff for a variety of medical issues, including following up on her knee surgeries and caring for general health problems that she has had in the past. (*See e.g.,* T. 295 (facial contusions in 2008), 293 (right knee pain in 2008); 292 (gastroenteritis in 2008), 291 (upper respiratory infection and weight gain in 2009)).  He is not a mental health professional.  In December of 2009, PA Brunt stated that plaintiff's medical history included Insomnia and Anxiety. (T. 279).

On March 12, 2010, the same day that plaintiff "protectively filed" for Social Security Disability Benefits, plaintiff also went to the Emergency Room at Binghamton General Hospital, complaining of being "anxious."[8] (T. 222).  Plaintiff described her symptoms as "moderate." (*Id.*)  The report states that plaintiff was oriented and "appear[ed] depressed." (T. 223).  However, her speech was normal, her thought processes and content were normal, and her insight and judgment were

---

[7] The court would also point out that as a Physician's Assistant, Joseph Brunt is not an acceptable medical source for establishing an impairment, although his opinion may be considered for the effect that an impairment has on plaintiff's ability to work. 20 C.F.R. § 404.1513(d)(1).

[8] Plaintiff was evaluated at the Comprehensive Psychiatric Emergency Program ("CPEP") at Binghamton General Hospital. (T. 220-29, 224).

normal. (*Id.*)  The "clinical impression" is listed as "Adjustment disorder with anxiety." (T. 224).  She was discharged in stable condition and referred to Psychiatrist, Dr. Suresh Undavia for "outpatient followup." (*Id.*)  The report was co-signed by PA Rose Larkin and Sabah Toma, MD, who stated that he or she "supervised care provided by the PA." (*Id.*)

There are handwritten notes from the same visit that are signed by an "evaluator," who does not appear to be either a PA or a physician. (T. 228).  The notes state that during the interview, plaintiff stated that she felt that her medication was not working, that she worried about "everything," including her health, her boyfriend's health, her finances, and her job." (T. 225).  Plaintiff's boyfriend stated that "since her surgery & out of work [sic] she is depressed and anxious." (*Id.*)  The handwritten notes state that all the information from the emergency evaluation was provided to "psychiatrist," Dr. Hameed, who made the diagnosis, and then plaintiff was "Medially Cleared" for discharge by Dr. Toma.[9]  (T. 228).  There is no mention of a panic disorder or agoraphobia in these records.

Three days after her emergency room visit, plaintiff was examined by PA Brunt, who noted that plaintiff had a followup appointment with "Dr. Shah, psychiatry." (T. 276).  On April 14, 2010, PA Brunt also noted that plaintiff had an appointment with Dr. Shah, but she was asking to be on "something" in the short term until her appointment with Dr. Shah. (T. 421).  PA Brunt noted only Insomnia and Anxiety as

---

[9] A third doctor's name appears on the form, listed as "ED Physician: Dr. S. Naman." (T. 228).  Dr. Naman apparently "agreed" to the medical clearance and Dr. Hameed's recommendation that plaintiff follow up with Dr. Undavia." (*Id.*)

mental diagnoses in the "Medical History" portion of his report. (T. 422).  PA Brunt prescribed Ativan for anxiety. (*Id.*)

On April 22, 2010, plaintiff was evaluated by psychiatrist, Dr. Undavia.[10] (T. 377-83).  The report contains some typewritten and some handwritten notes.  Dr. Undavia diagnosed "Generalized Anxiety Disorder with Panic Attack." (T. 379).  He assessed a GAF score of 60-65 (T. 379), indicating "mild symptoms" and an individual who is functioning "pretty well." DSM-IV-TR at 34.  Plaintiff's mental activity was spontaneous, lucid, and coherent. (T. 378).

There is no specific diagnosis or mention of agoraphobia in Dr. Undavia's report.[11]  In the section entitled "Diagnostic Conclusions, Recommendations and Remarks," Dr. Undavia states that the most likely diagnoses were "mood disorder," and generalized anxiety disorder with depressed mood, but that bipolar disorder needed to be ruled out. (T. 379).  There was no mention of panic disorder *with* agoraphobia.  In fact, a review of the report shows that when Dr. Undavia asked

---

[10] It does not appear that plaintiff ever saw a psychiatrist named Dr. Shah.  The subsequent reports were written by Dr. Undavia.

[11] According to the DSM-IV-TR at 429-43, agoraphobia often occurs within the context of Panic Disorder although it is possible to have agoraphobia without panic disorder as well as panic disorder with or without agoraphobia. *Id.*  The essential feature of agoraphobia is listed as anxiety about being in places or situations from which escape may be difficult or embarrassing or in which help might not be available in case of a Panic Attack. *Id.* at 433.  This anxiety typically leads to avoidance of situations that might include being alone outside one's home, being in a crowd of people, traveling with public transportation, and the anxiety or phobic avoidance is not better accounted for by another mental disorder. *Id.* at 433.  The DSM-IV-TR also states that agoraphobia is not a "codable" disorder, and it must be coded with the specific disorder in which it occurs, such as panic disorder. *Id.*

plaintiff why she went to CPEP, she stated that she was "frustrated and depressed."[12] (T. 379).  Plaintiff's visit to the emergency room and her general "anxiety" did not have anything to do with concern for being in a public place or being in a situation from which she might not be able to escape.

Agoraphobia was mentioned by Dr. Undavia on June 28, 2010, when plaintiff stated that she was "paranoid" and could not "go out of her apartment."[13] (T. 384).  Dr. Undavia asked plaintiff whether it was because she felt that people were "out to get [her]," and plaintiff said "no not really."  Dr. Undavia stated that "'[w]ell that is more or less an agoraphobia rather than paranoia." (*Id.*)  There was no actual diagnosis of agoraphobia in Dr. Undavia's notes of that examination. (*Id.*)   Dr. Undavia did not mention agoraphobia in his July 26, 2010 report, and plaintiff stated that her anxiety and panic attacks were because of worry about doing her yard work, paying bills, and cooking and cleaning. (T. 385).  Plaintiff also mentioned that she was uncertain about life and the world, and that she worried about everything. (*Id.*)

On August 25, 2010, plaintiff was evaluated at the Broome County Department of Mental Health Clinic (the "Clinic") by Kyle A. Webb, a Clinical Social Worker ("CSW").  Plaintiff's chief complaints were listed as anxiety, panic attacks, paranoia,

---

[12] Dr. Undavia asked plaintiff what the issues were that brought her to see the doctor, plaintiff stated that "'Well, I just felt anxious.  I worry a lot.  I worry about everything.  It doesn't make any sense doctor.  I asked, 'But there must be something specific bothering you' . . . .  She said, 'Well my two sons are in the military.  One is in Iraq.  At the same time, I feel quite upset about my own physical condition.'" (T. 378).

[13] Dr. Undavia's notes mainly consist of quotations from the conversations that he had with plaintiff on a particular day. (*See e.g.,* (T. 383-84).

fatigue, poor sleep, low self esteem, and insufficient coping skills for psychological stressors. (T. 390-91). The evaluation states that the *plaintiff reported* early adolescent history of emotional and anxiety issues, but "nothing clinical until about 10 years ago (first recalled panic attack) developed since then into panic disorder and agoraphobia." (T. 390). CSW Webb states a "Diagnostic Impression" of *inter alia*, Panic Disorder with Agoraphobia." (T. 391). Although CSW Webb indicated that plaintiff's current GAF was only 60, this score reflects symptoms at the mildest end of the "moderate" range. DSM-IV-TR at 34.

The August 25, 2010 evaluation states that it was "Reviewed" by Eric Lin, MD, a staff psychiatrist. Under "Treatment Recommendations," CSW Webb states that upon establishing plaintiff's attendance, plaintiff should have a psychiatric evaluation to review for medications and "clarify diagnosis."[14] (T. 391). There is no specific diagnosis of agoraphobia in conjunction with Panic Disorder, and it is not clear from the evaluation if there was any discussion of symptoms of agoraphobia other than plaintiff's statement that her panic attacks had "developed into" agoraphobia. (*Id.*)

On August 31, 2010, plaintiff went back to the Clinic. (T. 389). On what appears to be an intake form, Psychologist, Robert Russell, Ed.D., stated that the plaintiff "presents today with symptoms of panic and agoraphobia." (*Id.*) Psychologist Russell states on another section of the form that he provided plaintiff with a "brief introduction to Panic Control Training (PCT)," and he encouraged her to "buy the

---

[14] A clinical social worker is *not* an acceptable medical source for purposes of *establishing* an impairment. 20 C.F.R. §§ 404.1513(a), (d)(3).

workbook." (*Id.*)  There was no specific diagnosis of agoraphobia, nor was there any description of the symptoms of agoraphobia that plaintiff presented.

On September 10, 2010, Dr. Undavia noted that plaintiff was not seeing him frequently, and that she was "basically coming for medication management." (T. 386). Plaintiff stated that her insurance was running out, and Dr. Undavia explained that he would not be able to take care of her if she could not pay, and he referred plaintiff to the "County Clinic."  Plaintiff replied that she did not like anybody at the Clinic, and they were rude and mean there. (*Id.*)  Dr. Undavia stated that plaintiff could still see her primary care PA, Joseph Brunt, who could continue to see plaintiff until she obtained insurance. (T. 386).

On November 2, 2010, plaintiff was evaluated at the Clinic by Dr. Lin. (T. 393-94).  Dr. Lin stated that plaintiff was cooperative, her affect was adequate and appropriate, her mood was neutral during the interview, "but she claimed she has episode [sic] of depression, but most of the time, she has anxiety episodes and panic attacks." (T. 393).  Plaintiff mentioned that she had insomnia and occasional mood swings and anger episodes.  Her speech was spontaneous, relevant, and coherent, had no evidence of distractability, no language deviations, denied any delusional thinking or hallucinations, but "she claims she gets paranoia in a crowd of people.  She is also afraid of being at a high altitude." (T. 393-94).  Her general knowledge and intelligence were in the normal average range, and her insight and judgment into her own problems are rather fair." (T. 394).

Dr. Lin maintained the diagnosis of Panic Disorder with Agoraphobia and

Mood Disorder, NOS.[15]  He also noted that plaintiff had a lack of "primary support," a family history of depression, anxiety, mood problems, and alcoholism. (*Id.*)  On December 13, 2010, CSW Webb wrote that plaintiff was beginning to see therapy as more of a "vector for learning rather than a resource on which to lean and be carried. She is willing to develop coping skills to deal with life's stressors and unexpected challenges." (T. 398).  On February 17, 2011, Dr. Lin wrote that plaintiff "denies depression or mood swings." (T. 399).

Based on the psychiatric records in this case, and the fact that agoraphobia is often linked to panic attacks, the ALJ's determination not to mention agoraphobia when stating which of plaintiff's impairments were severe is supported by substantial evidence.  The ALJ found that plaintiff's panic disorder and depressive disorder were severe.  During his analysis of the listed impairments at Step *Three*, the ALJ mentioned plaintiff's agoraphobia in conjunction with her panic disorder in his determination that plaintiff had "moderate difficulties" in social functioning. (T. 11). There appear to be no references to symptoms of agoraphobia that would not be included in plaintiff's panic disorder.  The ALJ considered the limitations that would be imposed by plaintiff's panic disorder.  Therefore, the ALJ's determination at Step Two is supported by substantial evidence, and at worst, would be harmless error.

## B.   Treating Physician

### 1.   Legal Standards

A treating physician's opinion is not binding on the Commissioner, and the

---

[15] "NOS" is a term that means "Not Otherwise Specified."

opinion must be only given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

## 2.   Application

In this case, plaintiff argues that the ALJ did not appropriately consider the opinion of plaintiff's treating physicians in making his RFC determination regarding the limitations imposed by plaintiff's mental impairments.  Plaintiff argues that the ALJ did not even mention Dr. Undavia's opinion that plaintiff would not be "able to work" due to her emotional illnesses. (Pl.'s Br. at 8) (citing T. 412).  It is true that Dr. Undavia answered a question on a New York State form, stating that "yes she is disabled." (T. 412).  However, the question was whether plaintiff's "present condition [was] of a nature as to permanently disable applicant from performing all the duties of ***his present position***?" (*Id.*)

There is no question that plaintiff cannot perform the duties of her previous work.  The ALJ accepted the fact that plaintiff could not perform her previous position when he proceeded to Step Five of the disability analysis.  Thus, it is arguable that Dr. Undavia's "report" was not rejected by the ALJ if it related only to plaintiff's previous

work.

Even if Dr. Undavia were making the statement that plaintiff was "totally disabled," such a conclusory statement is not binding on the ALJ if that opinion is inconsistent with substantial evidence in the record. *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (citing *inter alia Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *Veino*, 312 F.3d at 588. *See* 20 C.F.R. § 404.1527(e)(1) (a statement by a medical source that a claimant is "disabled" does not mean that the Commissioner will make that determination). The term "disabled" is a legal not a medical definition. *Id.* Conflicts in the evidence are for the ALJ to resolve. *Id.* Additionally, to the extent that Dr. Undavia's report was used in plaintiff's Workers' Compensation case, another agency's determination of disability is not binding on the Social Security Administration, because the legal definition of "disability" is different for each agency. The Workers' Compensation standards are different that those for Social Security Disability. *Grey v. Chater*, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995).

Plaintiff also relies on the opinion of Dr. Lin and CSW Webb as a basis for alleging total disability. (Pl.'s Br. at 8) (citing T. 390, 393, 404). However, the fact that Dr. Lin diagnosed agoraphobia is not necessarily indicative of total disability. As stated above, agoraphobia is related to panic disorder. The ALJ considered plaintiff's panic disorder as a severe impairment and considered the effect of this disorder on plaintiff's ability to work. In fact, on the form completed by CSW Webb and signed by Dr. Lin, they circled  "periodically" in response to a question asking how often plaintiff experienced symptoms severe enough to "interfere with attention and

19

concentration. (T. 404).

The form also contains a "check mark" next to a statement that plaintiff is "Capable of low stress" work. (T. 404).  The next portion of the question asks for the basis for finding that plaintiff was capable of low stress work, and CSW Webb answered that plaintiff was in the early phase of her treatment, so it was inappropriate to consider factoring in "stress at this time." (*Id.*)  There is no statement by either Dr. Lin or CSW Webb that finds plaintiff completely disabled.  A fair reading of this form indicates that CSW Webb and Dr. Lin believed that plaintiff was capable of low stress work, but because it was early in her treatment, it was inappropriate to factor in any greater stress.

The same form indicated that plaintiff would have "good" and "bad" days, and "estimated" that plaintiff would be likely to be absent from work "more than three times a month." (T. 404).  The ALJ found that "the opinions regarding the need to miss work" were not "supported by the narrative medical reports." (T. 14).  The court notes that on January 3, 2011, CSW Webb stated that plaintiff was "highly insightful" and had an "immediate grasp of coping strategies." (T. 401).  On February 17, 2011 at 2:00 p.m., referencing a visit on December 17, 2010, Dr. Lin also stated in a report that plaintiff was cooperative, denied any side effects from her medication, was "better than before," and "denies depression or mood swings." (T. 399).  In another report, also signed on February 17, 2011 at 11:00 a.m., referencing a visit on November 18, 2010, Dr. Lin stated that plaintiff still had panic attacks and anxiety, but denied any paranoid delusions or hallucinations. (T. 396).

As evidence contradicting a finding of total disability, the ALJ cited the May 13, 2010, consultative examination by Dr. Dennis Noia, Ph.D. (T. 343-46).  Dr. Noia found that plaintiff's demeanor and responsiveness to questions was cooperative and that her manner of relating, social skills, and overall presentation was adequate. (T. 345).  Her mood was "neutral," and her thought processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking. (*Id.*) Her attention and concentration were intact, her memory skills were "slightly impaired," but her intellectual functioning was estimated in the "average" range. (*Id.*) Her insight and judgment were good. (*Id.*)

Dr. Noia found that "vocationally," plaintiff was capable of understanding and following simple instructions, was capable of performing simple and some complex tasks with supervision "and independently," appeared to be capable of maintaining attention and concentration for tasks, and she could regularly attend to a routine and maintain a schedule. (T. 346).  Although she appeared to have "some difficulty" dealing with stress, plaintiff appeared capable of making appropriate decisions, and relating and interacting "moderately well" with others. (*Id.*)

Non-examining reviewer, Dr. Inman-Dunton found, based upon plaintiff's records, particularly those of Dr. Noia, that plaintiff retained the ability to perform "at least simple work in a low contact setting." (T. 363).  This opinion is consistent with Dr. Noia's findings, but also consistent with CSW Webb and Dr. Lin's statement in February of 2011 that plaintiff was "capable of low stress" work. (T. 404).  The regulations permit the opinions of even non-examining sources to override treating

sources *provided they are supported by evidence in the record. See Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993) (citing 20 C.F.R. § 404.1527(f) and upholding newer regulations that allow the Commissioner to afford controlling weight to the opinion of a non-examining physician, notwithstanding variance with the Second Circuit's "version" of the treating physician rule).

In this case, the ALJ's finding is not inconsistent with the objective findings of the treating physicians, and is not even inconsistent with Dr. Undavia's conclusory statement that plaintiff was "disabled," given that Dr. Undavia's statement was in response to a question asking whether plaintiff could return to her previous work.  The ALJ stated that plaintiff's mental condition has been responsive to medication, has been of recent duration and has been minimal. (T. 14).  Dr. Undavia gave plaintiff a GAF score of 60-65 and even CSW Webb and Dr. Lin assessed a GAF score of 60, which as the ALJ stated, are still in the "mild to moderate" range. (T. 14-15).   The Second Circuit has held that the treating physician's "conclusions" regarding plaintiff's disability are far less probative than his or her objective medical assessment of plaintiff's specific capabilities and limitations. *Michels, supra*.

As stated above, conflicts in the evidence are for the ALJ to resolve. *Veino*, 312 F.3d at 588.  The ALJ justifiably found that plaintiff could perform low stress work. (T. 12).  Based on all the evidence of record, the ALJ's mental RFC finding, (T. 15), is supported by substantial evidence and is not inconsistent with the objective findings of plaintiff's treating physicians.

### C.   Credibility

#### 1.   Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following

symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2.    Application

Plaintiff argues that the ALJ did not properly analyze plaintiff's credibility and failed to credit her "outstanding" work record. (Pl.'s Br. at 12).  Plaintiff cites to a page in the transcript that is a summary of earnings for the years that plaintiff worked. Although work history may be deemed probative of credibility, it only one of the many factors to be considered. *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012); *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (citing *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)).  The ALJ in this case did not mention plaintiff's "work history."  However, the ALJ's failure to mention plaintiff's good work history does not undermine the ALJ's credibility assessment when there is substantial evidence in the record supporting the ALJ's determination. *Id.* (citing *Wavercak*, *supra.*)

In this case, the ALJ did not totally discredit plaintiff, he only found that her testimony was only *partially* substantiated by the objective evidence. (T. 15). Plaintiff's counsel claims that the ALJ ignored the fact that Dr. Noia found that the results of his examination were consistent with plaintiff's claims. (Pl.'s Br. at 12).

24

While Dr. Noia did state that the "[r]esults of the examination are consistent with allegations," this statement was at the end of a paragraph where he also found, based on his examination, that she was vocationally capable of many functions. (T. 346). The ALJ's RFC finding was not inconsistent with any of the functions that Dr. Noia found plaintiff able to perform and not even inconsistent with CSW Webb and Dr. Lin's statement that plaintiff could perform low stress work.  To the extent that plaintiff claimed additional or more serious restrictions, the ALJ's finding her only partially credible was supported by substantial evidence.

### D.    Vocational Expert

#### 1.    Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy.  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).  The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996).  *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience.  *Id.*  Based on these factors,

the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy.  *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted).  When significant nonexertional impairments[16] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen*, 802 F.2d at 603.  Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" will sole reliance on the Grids be deemed inappropriate.  *Id*. at 605-06. Case-by-case determinations can be difficult when an individual has mental impairments, and in Social Security Ruling (SSR) 85-15, the Social Security Administration has promulgated guidelines and examples that illustrate when a nonexertional limitation will "significantly limit" a claimant's range of work. 1985

---

[16] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).  Mental impairments are clearly nonexertional.

WL 56857, at *4.

An ALJ may determine whether a plaintiff's mental impairments "significantly diminish" his or her work capacity by determining whether the plaintiff can meet the basic mental demands of competitive, remunerative, and unskilled work as stated the SSR-15.  The ruling states that these basic demands include the ability, on a sustained basis, to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.*  A substantial loss of the ability to meet any of these demands would severely limit the potential occupational base at any exertional level and would, thus, "significantly diminish" the plaintiff's work capacity. *See Sipe v. Astrue*, No. 5:09-CV-1353, 2012 WL 2571268, at *8 (N.D.N.Y. July 3, 2012). This would prohibit the use of the Grids and necessitate the use of a VE to determine whether there would be any jobs left in the national economy that the plaintiff could perform.

### 2.    Application

Given plaintiff's mental (nonexertional) impairments, plaintiff argues that the ALJ should have called a VE to determine whether plaintiff could perform other work in the national economy at Step Five, notwithstanding plaintiff's exertional ability to perform sedentary work. (Pl.'s Br. at 13-15).

The ALJ first found that based on plaintiff's "physical ability" to perform sedentary work, and upon her age education, and prior work experience, the "Grid" dictated a finding of "not disabled." (T. 16) (citing 20 C.F.R. Pt. 404, Subpt. P, App.2

§ 201.21).  The ALJ then properly considered plaintiff's nonexertional mental impairments.  However, the ALJ found that the nonexertional impairments had "little or no effect on the occupational base of unskilled sedentary work." (T. 16).  As required by SSR 85-15, the ALJ then discussed the "basic mental demands of competitive, remunerative, unskilled work" that would be required at any exertional level. (T. 16).  These demands include the sustained ability to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. (T. 16).  The ALJ found that plaintiff was able to perform these basic functions of unskilled work, and using the "Grid," he found that plaintiff was not disabled. (T. 16).

The ALJ's determination is supported by substantial evidence.  Dr. Noia's report states that plaintiff can perform substantially all of the basic functions outlined by the ALJ. (T. 346).  A review of Dr. Inman-Dunton's mental RFC report also shows that plaintiff can perform substantially all of the basic mental functions required for unskilled sedentary work. (T. 361-63).  Dr. Inman-Dunton found that most of the abilities were "not significantly limited." (*Id.*)  He found "moderate limitations" only in plaintiff's ability to perform within a schedule and maintain regular attendance; the ability to work in close proximity with others without being distracted by them; the ability to work at a consistent pace and complete a normal workweek; the ability to interact with the general public; and the ability to travel to unfamiliar places or use public transportation. (*Id.*)  *Moderate* limitations in a few of the categories do not rise to the level of a "substantial loss" in the ability to perform the demands outlined in

SSR 85-15. *See Sipe v. Astrue*, 2012 WL 2571268, at *8 (affirming ALJ's decision not to use a VE when plaintiff was, *inter alia*, mildly or moderately limited in all the basic mental functions listed on the RFC form).

In this case, although the treating physicians did not identify plaintiff's ability to perform the specific functions stated in the regulations, Dr. Lin stated that plaintiff's speech was spontaneous, relevant and coherent, she had no evidence of language deviation or distractibilities, her recent and remote memory were rather fair, and her insight and judgment into her own problems were "rather fair," notwithstanding her other limitations. (T. 393-94). CSW Webb stated that plaintiff was "highly insightful" and she had an "immediate grasp of effective coping strategies." (T. 401). Dr. Lin and CSW Webb stated that plaintiff was capable of low stress work. (T. 404).

Thus, by finding that plaintiff did not have a substantial loss in the ability to meet any of the basic mental demands of unskilled work, the ALJ properly determined that plaintiff's nonexertional impairments did not significantly reduce the available jobs in the sedentary category, and his decision not to call a VE is supported by substantial evidence.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 6, 2012

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**